## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 96-CT-00030-SCT

*SUZANNE ILENE TAVARES*

*v.*

*STATE OF MISSISSIPPI*

### ON PETITION FOR WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/95 |
| TRIAL JUDGE: | HON. JOSEPH H. LOPER, JR. |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | GRADY F. TOLLISON, JR. |
| | AMY D. WHITTEN |
| | E. FARISH PERCY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: WAYNE SNUGGS |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 6/11/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/27/98 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

### Introduction

¶1. This case is before the Court sitting en banc on a petition for writ of certiorari filed by Suzanne Ilene Tavares. Ilene was convicted of murdering her husband, Jerry Tavares. She was sentenced to life imprisonment without possibility of parole. The Court of Appeals affirmed her conviction and sentence and her motion for rehearing. Ilene filed a timely petition for writ of certiorari which this Court granted. Finding no reversible error, this Court affirms Ilene's conviction and sentence.

### FACTS

¶2. Jerry Tavares was killed by three shots from a nine millimeter gun. Bennie Cork became a suspect

and informed the police that Jerry's murder was the result of a scheme involving Billy Joe Barnett, Glen Dale Davis, and Suzanne Ilene Tavares, the deceased's wife.

¶3. Cork testified that he was approached by Barnett to kill a man. Cork met with Barnett and Davis to discuss the murder. Cork agreed to kill Jerry and the three of them picked out a location to kill Jerry near the store owned by Jerry and Ilene. Cork and Davis took Barnett to the store so he could get Jerry to the murder site. Cork and Davis drove to the murder site and waited on Barnett and Jerry to arrive. Approximately thirty minutes later, Barnett and Jerry arrived in Jerry's truck. Barnett approached Cork, but Cork stated that he was not going to kill Jerry and turned around and walked off. Cork then heard two gunshots and when he turned around, he saw Barnett shoot Jerry a third time.

¶4. The three men then drove toward Little Mountain. Barnett told Cork that he was going to call Jerry's wife and let her know the location of the body. Cork testified that Barnett called a lady named "Ilene." Phone records were introduced at trial indicating that a phone call was placed from the Little Mountain Service Station to Ilene's home at 11:01 p.m. on May 11, 1992. Cork was then taken to Maben, Mississippi, and told to get rid of the gun. Cork threw the gun in a creek. It was later recovered by divers.

¶5. Cork was paid $500 to get rid of the gun. A check for $500 dated June 30, 1992, payable from Davis to Cork was introduced at trial. Barnett asked Davis to write the $500 check to Cork. Davis told Barnett that he did not have enough to cover the check and that Barnett would have to make a deposit the next day to cover it. A cash deposit in the amount of $495 was made to Davis's checking account on July 3, 1992.

¶6. Cork stated that Barnett was supposed to pay him, but Barnett had difficulty in cashing a $1,500 check given to him by Ilene. A check dated June 5, 1992, in the amount of $1,500 payable to Barnett was introduced at trial. The check was drawn on the store's account and signed by Ilene.

¶7. Mark Smith, an acquaintance of Jerry and Ilene Tavares and Billy Joe Barnett, testified that two weeks before the murder, Barnett approached him twice and offered him money and a vehicle to kill Jerry. Barnett told him that he could not pay him because he had to wait on some insurance money. Smith declined the offer on both occasions. The weekend before the murder, Smith traded a nine millimeter gun with Barnett. The gun traded to Barnett was the gun used in the murder. The morning following the murder, Barnett told Smith to report the gun as stolen.

¶8. At the time of Ilene's trial, Barnett had been convicted of capital murder and sentenced to life imprisonment without parole. Cork entered a plea of guilty to capital murder and received a sentence of life imprisonment with eligibility for parole. Davis had not been tried.

ISSUES

I. THE TRIAL COURT ERRED IN ADMITTING "FLIGHT" EVIDENCE AND IN GIVING "FLIGHT" INSTRUCTION.

II. THE TRIAL COURT ERRED IN IMPOSING AN ILLEGAL SENTENCE OF LIFE WITHOUT PAROLE.

**III. THE TRIAL COURT ERRED IN ADMITTING CO-CONSPIRATORS' HEARSAY STATEMENTS.**

**IV. THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE THAT BENNIE CORK FAILED POLYGRAPH TESTS.**

## ANALYSIS

### I. THE TRIAL COURT ERRED IN ADMITTING "FLIGHT" EVIDENCE AND IN GIVING "FLIGHT" INSTRUCTION.

¶9. On the day of her trial, Ilene did not appear. Ilene's bond was revoked and a warrant was issued for her arrest. She was located at approximately 7:00 p.m. in Attala County by Deputy Hudson of the Attala County Sheriff's Department. Deputy Hudson met Ilene head-on. He recognized her, turned his car around, and pursued her. Ilene sped away. Deputy Hudson chased her for approximately four miles before she lost control of her car and crashed into a ditch. Ilene was intoxicated and her car contained a gun with bullets, $2,247.63 in cash, numerous items of clothes and toiletries, photographs, a road atlas, jewelry, etc.

¶10. Ilene filed a motion in limine to keep this evidence from being presented to the jury. The trial judge denied the motion and based his reasoning on testimony presented at the hearing held on the motions for psychiatric examination and for release of personal property. Ilene testified that she left her house to go to the store to call her mother and that was the last thing she remembered before being stopped. She stated that the clothing and toilet items were in her car because she did not use the items anymore and did not have room for all of it in her home.

¶11. In denying the motion in limine, the trial judge relied on *Pannell v. State*, 455 So. 2d 785 (Miss. 1984), *Fuselier v. State*, 468 So. 2d 45 (Miss. 1985), and *Mack v. State*, 650 So. 2d 1289 (Miss. 1994). In *Pannell*, this Court held that a flight instruction was appropriate in cases where the flight was unexplained and in cases wherein flight has considerable probative value. *Id.* at 788. In *Fuselier*, this Court further held that "an instruction that flight may be considered as a circumstance of guilt or guilty knowledge is appropriate only where that flight is unexplained and somehow probative of guilt or guilty knowledge." *Id.* at 56-57. In *Mack*, this Court found that *Fuselier* implicitly held that "evidence of flight is inadmissible when independent reasons exist to explain the flight . . . ." *Id.* at 1309. Finally, the probative value must substantially outweigh its prejudicial effect. *Id.*

¶12. The trial judge made the following findings:

> I think based on the law that's developed since *Pannell* and, of course, *Pannell* was a development of prior law that you have to ask four things in determining whether or not flight evidence would be admissible.

> First would be is the flight unexplained, and I think clearly in this case the flight is unexplained. It's totally denied in fact. So, there's a complete dispute in the testimony as to whether or not flight even occurred at all. The Defendant denies that flight occurred. The deputy on the other hand states that he engaged in a high speed chase that resulted in the Defendant, in fact, running

in a ditch and wrecking her automobile. So, that is unexplained.

Now, the Defendant attempted to explain what she did on that date by stating that she blacked out, but that does not explain why she apparently came to as soon as she saw a deputy, and then still denies that she ran from him.

The Court also then will look at the next factor, does it have considerable probative value. And, the Court considered that, and it seems that all of the items in the automobile are consistent with someone that was attempting to flee, escape, or make a quick exit from the jurisdiction of the Court.

Many of the items in the car were apparently scattered around, which certainly tends to show someone that was grabbing as many things as possible trying to make a quick and hasty exit and not taking much time to do that.

Also, you look at the evidence that was actually in -- or the items that were actually in the automobile. It was clothes, shoes, suitcases with clothes in them, toiletry items, jewelry, family pictures, a Road Atlas, a large sum of case [sic]. That all is certainly probative of somebody that had guilty knowledge of the crime for which they were charged, and I think that the facts as exist as far as the items that were in the automobile, coupled with the fact that that was the day of her trial, would certainly show considerable probative value of the Defendant's consciousness of guilt of the crime for which she was going to be on trial.

The Court also then had to look at the factor, is the evidence of flight probative of things other than the guilt or guilty knowledge of the murder of Jerry Tavares.

In *Fuselier v. State* and *Mack v. State*, our Supreme Court stated that because the defendants were prison escapees that evidence of flight tended to show evidence of proof of guilty knowledge of escape, as well as proof of guilty knowledge of the crime for which they were on trial.

So, there was a situation where there were two separate and distinct trials, I mean crimes; if they ran from one crime they might have been running from the escape charge rather than from the crime for which they were on trial.

The Court seemed to be concerned that a defendant in those cases would have to put on proof of their prison escape in order to defend against the allegations that they were fleeing because of a sense of guilt for the crime for which they were on trial.

Now, in this case the Defendant argues that proof of flight in this case is as much evidence of guilt of failure to show up for trial or for a bond violation as it would be of guilt of the crime of capital murder. But, in reviewing the testimony of the Defendant, and if the Defendant had stated under testimony that that's why she ran that would be one thing, but the Defendant's testimony again, which was re-read yesterday afternoon by me, stated that she did not flee from the police at all. She stated that Deputy Hudson did not get in behind her. Since the Defendant denies that she engaged in flight from Deputy Hudson, she's not in the same position as the defendants in *Fuselier* and *Mack* are in. In those cases the defendants were prejudiced because

they would have to put on testimony of guilt of another crime in order to defend against the evidence that they were in flight because of a sense of guilt for the crime for which they were on trial.

However, in this case the Defendant will not be prejudiced because if she has to put on proof of commission of another crime because her testimony is that she did not engage in flight to begin with.

So, a total denial of flight is not the same type proof that the Supreme Court deemed prejudicial in *Mack* and *Fuselier*. The Defendant in this case simply would deny that she engaged in flight at all. Therefore, that would not bring up any evidence of any other crime that she had committed.

Also, I think that the fact that the failure to appear for trial is so inter-related with the charge for which the Defendant is on trial, I do not think that that would be considered by the Jury to be a separate crime to begin with.

Finally, the Court has to balance whether or not the probative value is substantially outweighed by the prejudicial effect so as to render the evidence inadmissible under Rule 4.03.

The Court is of the opinion that the probative value is not substantially outweighed, and, therefore, the Court will rule that the evidence will be admissible as to her attempt to flee the jurisdiction or attempt to flee from Officer Hudson on the date that her trial was set to begin.

¶13. The trial judge found that Ilene's flight was unexplained, that the case was distinguishable from *Fuselier* and *Mack* because Ilene denied that she fled, and that the probative value of the flight evidence was not outweighed by its prejudicial value.

¶14. The Court of Appeals affirmed the trial judge's finding:

Tavares contends that her situation is similar to that in *Mack*. She asserts that a totally independent basis existed for her flight from Deputy Hudson: the fact that she was in violation of her bond for failure to appear, and also that she was intoxicated at the time. However, Tavares herself testified that she was not fleeing from Deputy Hudson. She stated that she thought he was in pursuit of a speeding trucker. Therefore, any reliance on *Mack* is displaced as no independent basis existed for Tavares's flight.

From the record, it is clear that Tavares's flight was unexplained. She did not show at her trial in Grenada County on the morning of June 26, 1992, and was apprehended in Attala County later that evening. She sped away from Deputy Hudson causing him to reach speeds of 90 miles per hour in pursuit. She was intoxicated at the time of her "flight" from Deputy Hudson and crashed her vehicle into a ditch. She had everything except "the kitchen sink" in her car when she was apprehended. Based upon these facts, evidence of flight was probative of guilt or guilty knowledge and thus the introduction of evidence and the instruction on flight were warranted.

¶15. Ilene filed a supplemental brief in which she cites this Court's more recent opinion in *[Fuselier v. State, 702 So. 2d 388 (Miss. 1997)](#)*. Once again, this Court reversed and remanded Fuselier's case as a result of the State introducing evidence regarding Fuselier's flight. Unlike Ilene, however, Fuselier,

in both of his cases, could rationally explain his flight as not being evidence of guilt. The trial judge did not commit reversible error in admitting evidence of Ilene's flight.

## II. THE TRIAL COURT ERRED IN IMPOSING AN ILLEGAL SENTENCE OF LIFE WITHOUT PAROLE.

¶16. At the time of Jerry's murder, Miss. Code Ann. § 97-3-21 provided that anyone convicted of capital murder shall be sentenced to death or to imprisonment for life in the state penitentiary. At the time of Ilene's trial, § 97-3-21 had been revised to allow for life imprisonment without the possibility of parole. After the jury returned a verdict of guilty but prior to the granting of the sentencing instructions, defense counsel explained to Ilene that he could urge the trial judge to submit to the jury the option of life without the possibility of parole. Defense counsel told Ilene that she would have a better chance of a life sentence if this option were provided to the jury. The trial judge asked Ilene if she understood the proposal and Ilene stated that she did. The trial judge allowed the instruction insisted upon by Ilene. She now complains that the trial judge erred. We think otherwise.

¶17. The jury returned a sentence of life without the possibility of parole. The defense filed a motion to amend the judgment challenging the legality of the sentence. The trial judge found that the sentence did not violate the ex post facto clause of the federal or state constitutions and that the defense had waived any objections by requesting that life without possibility of parole be provided as a sentencing option. Relying on *Stevenson v. State*, 674 So. 2d 501 (Miss. 1996), the Court of Appeals affirmed the sentence finding that the defense had waived any ex post facto claims.

¶18. In *Lanier v. State*, 635 So. 2d 813 (Miss. 1994), and *Patterson v. State*, 660 So. 2d 966 (Miss. 1995), the defendants bargained for life sentences without the possibility of parole in order to avoid the death penalty. This Court found that even though the defendants had knowingly and voluntarily waived the possibility of parole, the trial court did not have the authority to impose such a sentence. In *Lanier*, the defendant was originally sentenced to death, but bargained for life imprisonment without the possibility of parole after his sentence was reversed and remanded. He appealed the denial of his request for post-conviction relief asking that this Court simply delete the "without possibility of parole" language. This Court found that the agreement was void and that upon remand, Lanier was subject to the death penalty. *Lanier*, 635 So. 2d at 819. *Patterson* involved a guilty plea. In finding that the guilty plea was invalid, this Court determined that Patterson had the right to be sentenced by a jury and that the State had the right to seek the death penalty. *Patterson*, 660 So. 2d at 969.

¶19. *Stevenson* also involved a guilty plea. This Court determined that the guilty plea was unenforceable and of no effect. *Stevenson*, 674 So. 2d at 506. Upon remand, this Court gave the following options: (1) the State can plea bargain with Stevenson and ask for his waiver of a potential ex post facto violation and have life without possibility of parole imposed under the new statute; (2) Stevenson can go to trial with the possibility of receiving the death penalty or life imprisonment with the possibility of parole; or (3) the State can allow Stevenson to enter a plea with the imposition of a life sentence with the possibility of parole.

¶20. The Court of Appeals found that *Stevenson* allows for the waiver of an ex post facto claim. *Stevenson*, however, involved an invalid plea bargain. This case involves an actual sentencing instruction presented to a jury.

¶21. In **_Dobbert v. Florida_, 432 U.S. 282 (1977)**, the statute at issue provided that anyone sentenced to life imprisonment must serve at least 25 years before becoming eligible for parole. The previous statute did not contain such a provision. The defendant, however, was sentenced to death. Dobbert did not receive a life sentence, and "so any added onus attaching to it as a result of the change in Florida law had no effect on him." **_Id._ at 298**. Dobbert, "having been sentenced to death, may not complain of burdens attached to the life sentence under the new law which may not have attached to it under the old." **_Id._ at 301**.

¶22. "The Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." **_Lindsey v. Washington_, 301 U.S. 397, 401 (1937)** (citations omitted). In **_California Dep't of Corrections v. Morales_, 514 U.S. 499 (1995)**, however, the United States Supreme Court stated that the "disadvantage" language in **_Lindsey_** was unnecessary. **_Id._ at 506 n.3**. "[T]he focus of the ex post facto inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." **_Id._**

¶23. Unlike **_Dobbert_**, the minimum penalty in the case at hand did not change. Life imprisonment with the possibility of parole was still an option. The maximum penalty, death, also did not change. The new statute only provided for an optional sentence that was more than the minimum and less than the maximum.

¶24. The Court of Appeals did not specifically state that the sentence violated the ex post facto clause, but it did find that ex post facto claims could be waived. This Court, however, finds that the amended statute is ameliorative. The amended statute is not onerous. It does not alter "the definition of criminal conduct or increase[] the penalty by which a crime is punishable." **_Morales_, 514 U.S. at 506 n.3**. Therefore, the trial judge did not err in allowing the jury to consider the option of sentencing Ilene to life without the possibility of parole. This Court finds that Ilene's sentence does not violate the ex post facto clause.

### III. THE TRIAL COURT ERRED IN ADMITTING CO-CONSPIRATORS' HEARSAY STATEMENTS.[1]

¶25. Ilene contends that the trial judge erred in allowing hearsay statements of Cork prior to establishing the existence of a conspiracy. In **_Ponthieux v. State_**, 532 So. 2d 1239 (Miss. 1988), this Court held that before a co-conspirator's testimony could be admitted under M.R.E. 801(d)(2)(E), "the prosecution had the obligation to establish the preliminary fact of the existence of the conspiracy . . . ." **_Id_**. at 1244. Ilene claims that it is not enough that the State introduced predicate proof of a conspiracy between Cork and Barnett, or Cork, Barnett, and Davis. She argues that the State had to establish proof of the existence of a conspiracy which included her before extraneous hearsay statements of co-conspirators can qualify for admission as non-hearsay under M.R.E. 801(d)(2)(E).

¶26. In determining that the trial judge did not err in allowing Cork's testimony, the Court of Appeals made the following analysis applying the holding in **_Ponthieux_**:

At the trial level, the prosecution is entitled to offer evidence of plan and motive to employ the

Rule 104 procedure to establish Rule 801(d)(2)(E) admissibility by showing that a conspiracy preceded consummation of the principal offense. ***Ponthieux v. State***, 532 So. 2d 1239, 1244 (Miss. 1988). This is especially true where the defendant is charged with having hired the victim killed, and the prosecution is proceeding on an accessory-before-the-fact theory. ***Id***. The circuit court is limited to the evidence offered at the Rule 104 hearing. ***Id***. However, on appeal, this Court will search the entire record to determine whether the preliminary fact of conspiracy has been established. "It is to the entire record that we employ a clearly erroneous standard of review." ***Id***.

Based upon the circuit court's standards, prior to Cork's testimony, it was established that the dead body of Jerry Tavares was found on a dirt road close to his convenience store. His body had been shot three times by a .9 millimeter weapon. Evidence showed that Jerry Tavares died as a result of .9 millimeter gunshots. An acquaintance of both Jerry and Ilene Tavares testified that both had stated that they would pay someone to have the other killed. Sheriff Steed testified that Cork told him where the gun and clip were. Steed stated that both the gun and clip were recovered from a stream. Steed testified as to the phone records from the Little Mountain service station to the Tavares's [sic] home. Steed also testified as to the location of the body. Finally, Steed stated that the arrests of Tavares, Barnett and Davis were immediately made after the conversation with Cork. Based on the above-mentioned evidence, we find evidence supporting a conspiracy was sufficiently proved prior to Cork's testimony.

Also, based upon our broader standards upon appeal, in the record we find substantial evidence to support the conspiracy to kill Jerry Tavares. We find that the existence of a conspiracy is supported by the following: (1) the location of the bullet wounds in Tavares's body; (2) the location of the body; (3) the evidence of the phone call made from the service station in Little Mountain to Tavares's home; (4) the location of the gun and the clip found in the creek; (5) the $1,500.00 check from J.R.'s Hwy. 12 Mart signed by Tavares made payable to Billy Barnett; (6) the $500.00 check from Glen Davis to Bennie Cork; (7) the cash-in deposit ticket in the amount of $495.00 into the checking account of Glen Davis; (8) the statement by Mark Smith that he had been approached by Barnett to kill Jerry Tavares for money; and (9) the fact that the gun traded to Barnett by Smith was the .9 millimeter used in the murder. We find that the evidence was not clearly erroneous as to the circuit court's finding of the existence of a conspiracy between Tavares, Cork, Barnett and Davis.

¶27. Upon review of the entire record, the Court of Appeals was correct in its determination that the trial judge's finding of the existence of a conspiracy was not clearly erroneous and does not constitute reversible error.

### IV. THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE THAT BENNIE CORK FAILED POLYGRAPH TESTS.

¶28. The defense learned that Cork failed two polygraph tests administered by the State prior to trial. The defense filed a motion to admit the results of the tests. A hearing was held and the defense requested permission to introduce evidence limited to establishing that Cork had failed two polygraph tests and specifically stated that it did not want to elicit information regarding individual questions and answers. The trial judge denied the motion finding that (1) polygraph tests are inadmissible in

Mississippi courts, (2) there was no basis to show that polygraph examinations had any scientific reliability, and (3) the results would be more prejudicial than probative under M.R.E. 403. The Court of Appeals held that the trial judge did not err in excluding the evidence.

¶29. Ilene cites *Conner v. State*, 632 So. 2d 1239 (Miss. 1993), *cert. denied*, 513 U.S. 927 (1994), in support of her argument that the trial judge erred in excluding the evidence. In *Conner*, this Court held that the admission of evidence that a witness had volunteered to take a polygraph test was not reversible error because it was being used to rehabilitate the veracity of the witness after the witness's credibility had been impeached. *Id.* at 1257-59. Ilene argues that there is no difference between admission on redirect for rehabilitation purposes and admission on cross-examination for impeachment purposes.

¶30. In *United States v. Piccinonna*, 885 F.2d 1529 (11th Cir. 1989), cited by this Court in *Conner*, the Eleventh Circuit held that "polygraph evidence may be admitted . . . when used to impeach or corroborate the testimony of a witness at trial." *Id.* at 1536. The Eleventh Circuit determined that three prerequisites to the admission of such evidence must be met: (1) the party offering the evidence must provide notice to opposing counsel; (2) the opposing party must have an opportunity to participate in or monitor the testing; and (3) where used for impeachment or rehabilitation, the predicate for admission must be properly laid. *Id.* Ilene contends that all three of these prerequisites were met.

¶31. The Court of Appeals determined that in *Conner* this Court found that the witness's willingness to take a polygraph was allowed because the defense, in its cross-examination, sought to impeach the witness's veracity. The results of the polygraph were not introduced.

¶32. Ilene wants to introduce the results of the polygraph tests for impeachment purposes. In *Carr v. State*, 655 So. 2d 824 (Miss. 1995), *cert. denied*, 516 U.S. 1076 (1996), however, this Court held that Mississippi law forbids the admission of the results of a polygraph test. *Id.* at 836.

## CONCLUSION

¶33. The trial judge did not commit reversible error in determining that the evidence was inadmissible. Accordingly, this Court affirms the judgment of the Court of Appeals.

¶34. **AFFIRMED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS, SMITH AND WALLER, JJ., CONCUR. McRAE, J., NOT PARTICIPATING.**

1. Ilene was also convicted of conspiracy and sentenced to 20 years. This conviction, however, was vacated pursuant to *Stewart v. State*, 662 So. 2d 552 (Miss. 1995), on the basis that conspiracy to commit murder-for-hire is contained in the statutory definition of capital murder-for-hire. *See* Miss. Code Ann. § 97-3-19(2)(d).