William **KEELS**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 98–CF–860.

District of Columbia Court of Appeals.

Argued June 8, 2001.

Decided Nov. 21, 2001.

Andrea Roth, Public Defender Service, with whom James Klein and Jennifer Lanoff, Public Defender Service, were on the brief, for appellant.

Matthew E. Sloan, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, John R. Fisher, Elizabeth Trosman, Oscar S. Mayers, Jr., and John M. Cummings, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, FARRELL, Associate Judge, and PRYOR, Senior Judge.

PRYOR, Senior Judge:

Following a jury trial, appellant William Keels was convicted of several offenses related to the homicide of Lydia Zygier. On June 26, 2000, Keels filed an initial appellate brief arguing that the trial court "improperly prohibited" defense counsel from conducting cross-examination and introducing impeachment evidence (collectively "evidentiary issues") during the trial. With leave of the court, Keels filed a supplemental brief on December 2, 2000, asserting that his sentence of life without parole should be vacated because D.C.Code § 22–2404.1 (1996), and the trial court's implementation of it, violated the principles set forth in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), a decision of the United States Supreme Court rendered the same day Keels filed his first appellate brief. The government filed a responsive brief. We are unpersuaded by Keels's evidentiary arguments; however, in light of the arguments based on *Apprendi*, we remand the case to the trial court for resentencing consistent with this opinion.

## I. INTRODUCTION

At approximately 12:45 a.m. on May 8, 1995, Zygier, a sixty-two-year-old female, was killed either inside or just outside the home she shared with her mother. While there were multiple wounds on her body, according to the medical examiner, Zygier died as a result of blunt force trauma to the face, neck, and skull. The medical examiner also concluded that Zygier had been sexually assaulted, opining that abrasions on the wall of her vagina were likely caused by the insertion of an object. Her body was found under a pile of foliage on

her property the morning following her death, and the police arrived on the scene a short time thereafter. Her clothes were disheveled, her undergarment was unfastened, and her underpants were found on top of the foliage covering her body. Semen stains found on Zygier's underpants contained Keels's deoxyribonucleic acid (DNA). Keels's fingerprints were found to match latent prints recovered at the murder scene. In addition, the government introduced forensic evidence of Keels's hair and clothing fibers to connect Keels to the scene of the murder.

After arriving at Zygier's house, the police became aware that her automobile, a 1968 Chrysler, was not in her garage or driveway. At approximately 6:00 p.m. on May 8, 1995, a detective assigned to canvass the area for the missing vehicle, Detective Robert Alder, observed Zygier's vehicle and navigated his unmarked cruiser alongside of it facing the opposite direction. Only one person, a male driver, was in the Chrysler. However, as Detective Alder attempted to maneuver his cruiser in order to stop the Chrysler, the driver sped off, weaving in and out of traffic. After a brief chase, Detective Alder lost sight of the vehicle and abandoned his pursuit. The Chrysler was found several days later in an alley. Detective Alder later identified Keels as the driver of the car from a photographic array.

After a warrant had been issued for his arrest, Keels turned himself in to the police and was formally arrested on May 15, 1998. At that time, the police found a set of keys to Zygier's Chrysler in one of Keels's pockets. Following the arrest, one of the detectives, Detective Greg DePasse, handcuffed Keels in an interview room. Nearly three hours later, Detective DePasse conducted a videotaped interview with Keels. Prior to his videotaped statement, Keels had been advised of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). During the interview, Keels admitted that he had stolen Zygier's car keys from her house while visiting her the evening of May 7, 1995. When Keels returned later that night to take her car, Zygier confronted him and, according to Keels, hit him. Keels admitted that he subsequently struck Zygier on the head with an object a few times, causing her to fall to the ground. While Keels stated that he did not know that Zygier was dead, he acknowledged that he had covered her body with grass before leaving the scene. Keels specifically denied having sexual relations with Zygier. He concluded the videotaped interview, which was seen by the jury, by reaffirming the veracity of his testimony.

A central component to Keels's defense was that his videotaped statement was coerced.[1] Keels elected to testify on his own behalf at trial. He revealed that he had known Zygier for several years and had become sexually intimate with her. Keels testified that at approximately 4:00 p.m. on the afternoon before the murder,

---

1. The trial court denied Keels's pretrial motion to suppress the videotaped confession finding that Keels had been informed of his *Miranda* rights and had made a knowing, intelligent, and voluntary waiver of them. The trial court also found no due process violation.

Keels also filed substantive pretrial motions challenging his arrest warrant, a warrant to search Zygier's house, and Detective Alder's identification of him from a photo array. The argument regarding the arrest warrant was primarily predicated on an allegedly erroneous statement in an affidavit executed by Detective DePasse suggesting that Keels's fingerprints were found inside Zygier's residence (when in fact they were only found outside her home). This same affidavit provides the basis for one of Keels's evidentiary claims on appeal. The trial court denied all three of these motions as well.

he went to Zygier's house and had sexual intercourse with her. According to Keels, Zygier thereafter gave him permission to borrow her automobile, and he left.[2] Keels disclaimed any involvement in, or knowledge of, the events surrounding Zygier's death at trial. In response to queries about his failure to return Zygier's automobile, Keels stated that the sight of the police in front of Zygier's home the following morning scared him into keeping the vehicle. Keels also testified that he had been threatened and otherwise coerced into providing his videotaped statement.

Prior to the trial, the government, pursuant to its obligations under D.C.Code § 22–2404(a) (1996), put Keels on notice that it would be seeking a sentence of life without parole ("LWOP") should he be convicted of first-degree murder. On January 26, 1998, a jury found Keels guilty of armed robbery, see D.C.Code §§ 22–2901, –3202, –3901(a) (1996), armed car jacking, see D.C.Code § 22–2903 (1996), unauthorized use of a vehicle, see D.C.Code § 22–3815, second-degree burglary, see D.C.Code § 22–1801(b) (1996), first-degree murder while armed (felony murder predicated on the armed robbery conviction), see D.C.Code §§ 22–2401, –3202 (1996), second-degree murder while armed, see D.C.Code §§ 22–2401, 3202 (1996), and first-degree theft from a person sixty years of age or older, see D.C.Code §§ 22–3811, –3812(a), 3901(a) (1996).[3] Following the guilty verdict, the government formally requested that Keels be sentenced to LWOP for his conviction of felony murder (robbery). Following a

sentencing hearing, the trial judge agreed with the government and sentenced Keels to punishment including LWOP. The trial judge relied on three of the "aggravating circumstances" enumerated in § 22–2404.1 to support her decision: first, the murder of Zygier "was especially heinous, atrocious, or cruel," see D.C.Code § 22–2404.1(b)(4) (1996); second, "[t]he murder was committed while committing or attempting to commit a robbery, arson, rape, or sexual offense," see D.C.Code § 22–2404.1(b)(8) (1996); and third, "[Zygier] was especially vulnerable due to age or a mental or physical infirmity," see D.C.Code § 22–2404.1(b)(10) (1996).

Thereafter, Keels submitted a timely notice of appeal. On June 26, 2000, Keels filed an initial appellate brief arguing that the trial court "improperly prohibited" defense counsel from conducting cross-examination and introducing impeachment evidence. With leave of the court, Keels filed a supplemental brief on December 2, 2000, asserting that his sentence of life without parole should be vacated because D.C.Code § 22–2404.1, and the trial court's implementation of it, violated the principles set forth in *Apprendi v. New Jersey, supra.* The government filed a brief in opposition.

## II. *EVIDENTIARY ISSUES*

■ Keels argues that the trial court improperly restricted defense counsel's cross-examination of Detective Alder by refusing to permit questioning about a purported violation of a Metropolitan Police Department ("MPD") General Order.

2. As a part of the government's brief rebuttal case, Zygier's niece, Julie Espinoza, testified that she had never seen anyone other than her aunt drive the 1968 Chrysler.

3. Keels was acquitted of two counts of first-degree burglary while armed, see D.C.Code

§§ 22–1801(a), –3202 (1996), first-degree murder (premeditated), see D.C.Code §§ 22–2401, –3202 (1996), assault with a dangerous weapon, see D.C.Code § 22–502 (1996), and two counts of destruction of property, see D.C.Code § 22–403 (1996).

At trial, the defense sought to bolster its claim that no high-speed chase ever occurred by asserting that a law-abiding police officer in Detective Alder's situation would not have engaged in a chase that was contrary to department guidelines.[4] Citing *Allen v. United States*, 603 A.2d 1219, 1223 (D.C.1992) (en banc), Keels argues that he should have been able to impugn Detective Alder's credibility "by showing that he did not do the things a reasonable person might have done in his situation."

■ Similarly, Keels also urges that the trial court erroneously precluded defense counsel from cross-examining Detective DePasse regarding a purported violation of a police procedure that requires an officer to interview a witness before videotaping a statement. The defense, in attempting to buttress its contention that Keels's videotaped statement was coerced, sought to show that Detective DePasse "lied about his pre-videotaped statement conduct" by asserting that his actions prior to the videotaping conflicted with police protocol. Keels argues that because the government was permitted to ask a witness "about police procedures for consultation between junior and senior officers when taking videotaped statements," he should have been allowed to query Detective DePasse about the pre-videotape interview.

■ The trial court was skeptical of the probative value of these lines of cross-examination, and of the logical relationship between them and defense counsel's asserted impeachment objective. "Although the opportunity to cross-examine a witness is a fundamental right, which is guaranteed in a criminal trial through the [C]onfrontation [C]lause of the Sixth Amendment, the extent and scope of cross-examination of a witness ... is committed to the sound discretion of the trial court." *Moore v. United States*, 757 A.2d 78, 85 (D.C.2000) (citations and internal quotation marks omitted). Accordingly, we review both of these claims under an abuse of discretion standard. *See Jones v. United States*, 739 A.2d 348, 350 (D.C. 1999); *Frost v. United States*, 618 A.2d 653, 664 n. 21 (D.C.1992); *Payne v. United States*, 516 A.2d 484, 497–98 (D.C.1986). A trial court may, in the exercise of its discretion, "limit cross-examination into matters having little relevance or probative value to the issues raised at trial." *Payne, supra*, 516 A.2d at 498 (citation omitted); *accord Hawkins v. United States*, 461 A.2d 1025, 1034 (D.C.1983) ("The scope of cross-examination generally is committed to the trial court's discretion, ... and the court in its discretion may restrict questioning about matters with little relevance or probative value."). In light of the extensive cross-examination of both witnesses and the limited relevance, if any, of the precluded line of questioning, we cannot say on these facts that the trial court abused its discretion.

■ Next, Keels argues that the trial court improperly restricted cross-examination of Detective DePasse by precluding questioning about his lay opinion regarding Keels's guilt. "Whether an opinion is helpful to the jury and hence admissible is a question entrusted to the sound discretion of the trial court, and its admission of such testimony will not be overturned unless it constitutes a clear abuse of discretion." *Carter v. United States*, 614 A.2d

---

4. MPD General Order 301.3 indicates that a police officer should undertake a high-speed chase only when driving a marked car or emergency vehicle and after initiating contact with the police dispatcher. Detective Alder testified that he chased Keels in an unmarked police cruiser. Any radio communication between Detective Alder and central dispatch was either erased or destroyed and, thus, was not produced at trial.

913, 919 (D.C.1992) (citation and internal quotation marks omitted); *accord Bedney v. United States,* 684 A.2d 759, 767 (D.C. 1996); *cf. Moore, supra,* 757 A.2d at 85; *Jones, supra,* 739 A.2d at 350. The trial judge, while allowing significant cross-examination premised on the defense's theory that Detective DePasse was biased against Keels and looking to impute guilt to him, refused to permit defense counsel to ask Detective DePasse whether *he believed* "whoever had the car was [the] murderer." Detective DePasse had previously testified that it was a "distinct possibility" that whoever had Zygier's vehicle was the perpetrator. Moreover, defense counsel was permitted to, and did, advocate during closing argument that Detective DePasse's actions were clouded by his belief in Keels's guilt and his desire to secure a conviction. Again, on these facts we cannot say that the trial court abused its discretion. Even if we were to rule otherwise, however, such error would not be reversible under either the *Kotteakos* standard, *see Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), or the *Chapman* standard, *see Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Cf. Clark v. United States,* 639 A.2d 76, 82 (D.C.1993) (suggesting *Kotteakos* standard applicable to the instant situation).

■ Keels also claims that "the trial court committed error by preventing [his] attempt to prove Detective DePasse's corruption or bias through extrinsic evidence." After the government had rested its case-in-chief and, thus, after defense counsel had conducted cross-examination of Detective DePasse, the defense sought to re-call Detective DePasse during its case to attack his credibility and further demonstrate his bias with an allegedly untruthful statement in a sworn affidavit executed in support of Keels's arrest warrant.[5] The trial court concluded that this line of attack was improper, foreclosing both the introduction of extrinsic impeachment evidence (the affidavit) and defense counsel's examination of Detective DePasse about it. The defense was, however, permitted to assert during its closing argument that Detective DePasse's actions were affected by his belief in Keels's guilt and his desire to secure a conviction. On appeal, Keels argues that since impeachment evidence pertaining to bias can be elicited either through cross-examination or through extrinsic evidence, *see Bassil v. United States,* 517 A.2d 714, 716–17 (D.C. 1986); *In re C.B.N.,* 499 A.2d 1215, 1218–19 (D.C.1985), he should have been free to query Detective DePasse about his statement in the affidavit and introduce the affidavit into evidence.

■ In the context of a matter clearly contested before the trial judge, we decline to accept the government's invitation for plain error review. While it appears that defense counsel primarily sought to undermine Detective DePasse's veracity and credibility with the affidavit, the record

---

5. In the affidavit at issue, Detective DePasse stated under oath that the Mobile Crime Lab was "able to lift several [of Keels's] fingerprints from ... both inside and outside [Zygier's] house." While Keels's fingerprints were apparently found on the outside of an exterior door jam, it appears they were not, strictly speaking, found in the interior of the house.

In a pretrial "motion to suppress evidence ... obtained as a result of an invalid arrest warrant," defense counsel argued that Detective DePasse's "misrepresentation" regarding the fingerprint evidence rendered the issuance of Keels's arrest warrant invalid for lack of probable cause. Without delving into the issue of whether DePasse's statement constituted perjury, the trial court denied Keels's pretrial motion, ruling that regardless of the discrepancy with respect to the fingerprints, there was sufficient probable cause to issue the warrant.

reveals that defense counsel sufficiently articulated his bias rationale to the trial court in order to preserve the issue for appeal. However, in these limited circumstances, because Keels had the opportunity to cross-examine Detective DePasse on this issue during the government's case in-chief, it was within the trial court's discretion to disallow Keels any further examination of Detective DePasse about the affidavit during the defense's case. *See Moore v. United States, supra,* 757 A.2d at 86 (holding trial court did not abuse its discretion in disallowing defense to question a government witness, as a part of its case, about a subject which could have been broached during cross-examination of that witness during government's case); *cf. United States v. Gaviria,* 325 U.S.App. D.C. 322, 348, 116 F.3d 1498, 1524 (1997). "[O]nce a party has had an opportunity substantially to exercise the right of cross-examination, the extent of further interrogation is within the sound discretion of the trial court...." *Singletary v. United States,* 383 A.2d 1064, 1073 (D.C.1978) (citations omitted). If the trial court permissibly could curtail further examination of Detective DePasse about the affidavit, it follows that it could also prohibit the introduction of the affidavit as extrinsic impeachment evidence on these narrow facts as well. Furthermore, even assuming the trial court abused its discretion, reversal would not be warranted under *Kotteakos, supra,* or *Chapman, supra. Cf. Moore, supra,* 757 A.2d at 86 (quoting *Singletary, supra,* and suggesting *Kotteakos* standard applicable to the instant situation).

## III. *APPRENDI ISSUES*

■ In *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court declared unconstitutional the hate crime sentencing scheme in New Jersey whereby a judge, after finding by a preponderance of the

evidence that a crime was committed with a "biased purpose," could sentence a defendant to greater punishment than that prescribed for the original offense. *See Apprendi, supra,* 530 U.S. at 491, 120 S.Ct. 2348. In doing so, the Court set forth the following rule:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt ... It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.

*Id.* at 490, 120 S.Ct. 2348 (citation and internal quotation marks omitted). Put another way, when a defendant exercises the right to a jury trial, a sentencing procedure which exposes the accused to a greater punishment than authorized by the jury's verdict violates *Apprendi*'s prohibition.

## A. *PERTINENT D.C. STATUTES*

Determining whether the District of Columbia's LWOP sentencing scheme comports with the principles annunciated in *Apprendi* involves an examination of two statutes: D.C.Code § 22–2404 (1996), which establishes the penalties for first and second degree murder; and D.C.Code § 22–2404.1 (1996), which sets forth the sentencing procedure for LWOP. Because of their import to this case, we recite each statute in its entirety. Section 22–2404 provides:

> (a) The punishment for murder in the first degree shall be life imprisonment, except that the court may impose a punishment of life imprisonment without parole in accordance with § 22–2404.1. The prosecution shall notify the defendant in

writing at least 30 days prior to trial that it intends to seek a sentence of life imprisonment without parole as provided in § 22–2404.1; provided that, no person who was less than 18 years of age at the time the murder was committed shall be sentenced to life imprisonment without parole.

(b) Notwithstanding any other provision of law, a person convicted of murder in the first degree and upon whom a sentence of life imprisonment is imposed shall be eligible for parole only after the expiration of 30 years from the date of the commencement of the sentence.

(c) Whoever is guilty of murder in the second degree shall be sentenced to a maximum period of incarceration of not less than 20 years and not more than life. Notwithstanding any other provision of law, where the maximum sentence imposed is life imprisonment, a minimum sentence shall be imposed which shall not exceed 20 years imprisonment.

Section 22–2404 creates a sentence for first degree murder of life imprisonment with the possibility of parole after thirty years. *See* D.C.Code § 22–2404(a)–(b). Indeed, the only sentencing variable for first degree murder is the parole eligibility date of the offender. If the government satisfies its procedural obligations under § 22–2404(a), and the required finding under § 22–2404.1 is made, then a sentence of LWOP can attach. In all other cases, the offender shall be eligible for parole after thirty years.

For the purpose of this appeal,[6] § 22–2404.1 provides:

(a) If a defendant is convicted of murder in the first degree, and if the prosecu-

tion has given the notice required under § 22–2404(a), a separate sentencing procedure shall be conducted as soon as practicable after the trial has been completed to determine whether to impose a sentence of life imprisonment or life imprisonment without possibility of parole.

(b) *In determining the sentence, the court shall consider whether, beyond a reasonable doubt, any of the following aggravating circumstances exist:*

(1) The murder was committed in the course of kidnaping or abduction, or an attempt to kidnap or abduct;

(2) The murder was committed for hire;

(3) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

(4) The murder was especially heinous, atrocious, or cruel;

(5) The murder was a drive-by or random shooting;

(6) There was more than 1 offense of murder in the first degree arising out of 1 incident;

(7) The murder was committed because of the victim's race, color, religion, national origin, or sexual orientation;

(8) The murder was committed while committing or attempting to commit a robbery, arson, rape, or sexual offense;

(9) The murder was committed because the victim was or had been a witness in any criminal investigation or judicial proceeding, or the victim was capable of providing or had pro-

**6.** Effective August 11, 2000, § 22–2404.1 was amended. Following the amendment, the language "the court shall consider" in subparagraph (b) above was replaced with "a finding shall be made." Corresponding language in section 22–2404.1(c) was also changed in a similar manner.

vided assistance in any criminal investigation or proceeding;

(10) The murder victim was especially vulnerable due to age or a mental or physical infirmity;

(11) The murder is committed after substantial planning; or

(12) At the time of the commission of the murder, the defendant had previously been convicted and sentenced, whether in a court of the District of Columbia, of the United States, or of any state, for (A) murder, (B) manslaughter, (C) any attempt, solicitation, or conspiracy to commit murder, (D) assault with intent to kill, (E) assault with intent to murder, or (F) at least twice, for any offense or offenses, described in § 22 3201(f), whether committed in the District of Columbia or any other state, or the United States. A person shall be considered as having been convicted and sentenced twice for an offense or offenses when the initial sentencing for the conviction in the first offense preceded the commission of the second offense and initial sentencing for the second offense preceded the commission of the instant murder.

(c) The court shall state in writing *whether, beyond a reasonable doubt, 1 or more of the aggravating circumstances exist. If the court finds 1 or more aggravating circumstances exist, a sentence of life imprisonment without parole may be imposed.*

(d) If the trial court is reversed on appeal because of error only in the separate sentencing procedure, any new proceeding before the trial court shall pertain only to the issue of sentencing. [Emphases added.]

This procedure permits the imposition of LWOP if the government satisfies its procedural obligations and, following a separate sentencing procedure, one (or more) of the listed aggravating factors is found beyond a reasonable doubt. *See* D.C.Code § 22–2404.1(c).

## B. *KEELS'S SENTENCE*

In this case, the decision to sentence Keels to LWOP was predicated on § 22–2404.1(b)(4) (the "heinous, atrocious, or cruel" factor), § 22–2404.1(b)(10) (the "vulnerab[ility] due to age or a mental or physical infirmity" factor), and § 22–2404.1(b)(8) (the felony murder factor). With respect to the "heinous, atrocious, or cruel" factor, the trial court referenced the medical evidence which demonstrated that Zygier did not die instantaneously, that she had suffered numerous wounds, and that an object had been inserted into her vagina. Regarding the "vulnerab[ility] due to age or a mental or physical infirmity" factor, the trial court predominantly relied upon the discrepancy between the age and weight of the victim (sixty-two-years-old and one-hundred and twenty-six pounds) and that of Keels at the time of the murder (twenty-two-years-old and over two-hundred pounds). The trial court also referred to the evidence indicating that Zygier had suffered defensive wounds. Finally, in support of the felony murder factor, the trial court noted that the jury verdict established that the murder was committed while committing (or attempting to commit) a robbery.

## C. *ANALYSIS*

Keels asserts that the sentencing procedure created by § 22–2404.1, in conjunction with § 22–2404, runs afoul of *Apprendi* and, thus, violates the United States Constitution both on its face and as applied to him personally. Specifically, Keels argues that because LWOP is a greater sanction than life imprisonment with the possibility of parole, it is unconsti-

tutional under *Apprendi* to permit *the trial judge* to find one or more of the statutorily defined aggravating factors beyond a reasonable doubt, thereby triggering the possible imposition of the heightened sentence. Rather, according to Keels, *Apprendi* dictates that such a finding must be left to the jury. Keels asks us to remand the case to a new judge for re-sentencing with instructions that a sentence of life imprisonment with the possibility of parole be issued.

The government responds with several arguments. First, the government disagrees that a sentence of LWOP represents an increase in the prescribed statutory maximum penalty for first-degree murder. Second, the government argues that D.C.Code § 22–2404.1 is neither unconstitutional on its face nor as applied to this case. Central to the government's argument is that by convicting Keels of felony murder (robbery) the jury found, beyond a reasonable doubt, one of the three aggravating factors relied upon by the trial judge. *See* D.C.Code § 22–2404.1(b)(8) ("The murder was committed while committing or attempting to commit a robbery, arson, rape, or sexual offense."). According to the government, therefore, the precise requirements of *Apprendi* were satisfied in this case. Finally, and in any event, the government argues that if we find *Apprendi* error and remand the case, the trial court may still exercise its discretion to impose a LWOP sentence in light of the jury's verdict, and there is no reason why the original trial and sentencing judge should not be entrusted with that exercise of discretion.

**1.**

■■■ Because *Apprendi* was decided after the sentencing in this case, both parties agree that we must review the propriety of Keels's sentence under the plain error standard.[7] In order for Keels's sentence to have violated *Apprendi*, the trial court must have sentenced him to a penalty "beyond the prescribed statutory maximum" for the offense of which he was convicted. *Apprendi, supra,* 530 U.S. at 490, 120 S.Ct. 2348. If the trial court did not do so, then neither the court's discretionary sentencing decision nor the statutory construct set forth in D.C.Code §§ 22–2404 and 22–2404.1 would violate the Constitution in this case. But if a LWOP sentence exceeds the statutory maximum for first-degree murder, and the trial court imposed the sentence based upon its own–not the jury's–finding of facts establishing Keels's eligibility for LWOP, then *Apprendi* was violated and, in our judgment, the resulting sentence would be plain error, because it seriously affected the fairness and integrity of Keels's sentencing. *See Johnson, supra* note 7, 520 U.S. at 467, 117 S.Ct. 1544.

The government first argues that a sentence of LWOP does not increase the statutory maximum for first-degree murder. The maximum sentence for first-degree murder, it contends, is life imprisonment. Even without enactment of the LWOP

---

**7.** In regard to plain error analysis, the government concedes (as it must) that "where the law at the time of the trial was settled and clearly contrary to the law at the time of appeal," as in this case, "it is enough that an error be 'plain' at the time of appellate consideration." *(Joyce) Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). The government nonetheless contends that the standards for plain error have not been met because, even on the assumption that *Apprendi* was violated, Keels has not shown that "the error seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings." *Johnson,* 520 U.S. at 467, 117 S.Ct. 1544 (citations and internal quotations omitted). As our discussion in the text will demonstrate, we do not agree.

provision, all those convicted of first degree murder *could* spend the rest of their lives in prison, and unless an independent board decides to grant them parole, they *will* do so. According to the government, therefore, the abrogation of parole eligibility represents not an increase in the prescribed statutory maximum sentence, but a permissible increase in the *mandatory minimum* sentence. *See* Supp. Br. for Appellee at 40 ("The [trial] court did not increase [the] statutory maximum by sentencing [Keels] to life without parole; it merely increased the mandatory minimum by stripping the parole commission of discretion to release him after the expiration of 30 years, but prior to his death."). Although the government may be correct that an increase in the mandatory minimum sentence would not violate *Apprendi,* *see McMillan v. Pennsylvania,* 477 U.S. 79, 92–93, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (permissible to increase a mandatory minimum sentence based solely on facts found by a sentencing judge);[8] *see also United States v. Rodgers,* 245 F.3d 961, 966–67 (7th Cir.2001), we cannot accept its argument that imposition of a LWOP sentence does no more than increase the mandatory minimum.

Both legally and empirically, LWOP represents a greater penal sanction than life imprisonment with the possibility of parole. Indeed, as we have explicitly recognized, LWOP is the most extreme sentence our court system can impose. *See Page v. United States,* 715 A.2d 890, 893 (D.C.1998) ("[Sections] 22–2404 and 22–2404.1 narrow[ ] the class of murderers eligible for *the District's ultimate sentence* . . . .)" (emphasis added); *Heard v. United States,* 686 A.2d 1026, 1032 (D.C.1996) (LWOP is "more severe sentence" than life

imprisonment; life imprisonment represents "lesser maximum punishment"). Equally important, the legislature has recognized that taking away one's right to parole is a significant, distinct, and severe penalty. *See* Council of District of Columbia, Committee on the Judiciary, Report on Bill No. 9–118: First Degree Murder Amendment Act of 1992 (1992) (enacted as D.C. Law 9–153). According to the legislative history, the predominant reason the legislature enacted § 22–2404.1 was to create "harsher penalties for first degree murder." *Id.* at 3 ("The 'First Degree Murder Act of 1992' answers the call for harsher penalties for first-degree murder by establishing a penalty of life without parole where aggravating circumstances exist."). Indeed, § 22–2404(a) is written in such a way that a sentence of LWOP represents an *exception* to the normal punishment for first-degree murder. *See* D.C.Code § 22–2404(a) ("The punishment for murder in the first degree shall be life imprisonment, *except* that the court may impose a punishment of [LWOP] . . . .") (emphasis added). The statute also makes clear that the legislature only chose to subject a defined class of first degree murderers to D.C.Code § 22–2404.1 and, thus, to the LWOP sentence.

The intuitive and straightforward proposition that "life without parole" is a more severe punishment than "life with the possibility of parole" is supported analogously by state court decisions holding that retroactive application of LWOP statutes to offenders who would otherwise only face life imprisonment is unconstitutional *because* LWOP is an increased punishment. *See, e.g., Tavares v. State,* 725 So.2d 803, 809 (Miss.1998) (describing LWOP sentence as less than the maximum of death but more

---

8. The Court in *Apprendi* "reserve[d] for another day the question whether *stare decisis* considerations preclude reconsideration of" this holding of *McMillan. See* 530 U.S. at 487 n. 13, 120 S.Ct. 2348.

than the minimum of life imprisonment); *Miller v. Warden,* 112 Nev. 930, 921 P.2d 882, 884 (1996) (agreeing with defendant that "eliminating the possibility of commutation to 'life with' increases the measure of punishment for first-degree murder"); *State v. Conner,* 345 N.C. 319, 480 S.E.2d 626, 631 (1997) (defendant in capital case was not entitled to retroactive application of new LWOP statute because it "clearly increased the punishment for first-degree murder"); *Allen v. State,* 821 P.2d 371, 376 (Okla.Crim.App.1991) (describing LWOP as an intermediate level of punishment between the maximum of death and minimum of life in prison); *State v. Bullock,* 263 La. 946, 269 So.2d 824, 826 (1972) (retroactive application of LWOP statute to defendant who would otherwise face life imprisonment was unconstitutional because it "inflict[ed] a greater punishment").[9]

Ultimately the government's distinction between a mandatory minimum and a maximum sentence in the present context is one of words. LWOP in effect collapses the distinction between a minimum and a maximum sentence in favor of a determinate sentence of life without the possibility of parole. That sentence is undeniably more burdensome to the defendant than life with the possibility of parole. *Cf. Lynce v. Mathis,* 519 U.S. 433, 441, 447, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997) (statute that made ineligible for early release class of prisoners previously eligible "disadvantage[d] the offender" and so could not constitutionally be applied retroactively). Excluding the jury from the determination

of an offender's eligibility for heightened punishment of this kind distorts *McMillan,* a true mandatory minimum case, and cannot be reconciled with *Apprendi.*

**2.**

Section 22–2404.1(c) permits the imposition of LWOP if the government satisfies its procedural obligations and, following a separate sentencing procedure, the court "finds that 1 or more aggravating circumstances [listed in D.C.Code § 22–2404.1(b)(1–12)] exists" beyond a reasonable doubt. In sub-paragraph (b), the precise language of the statute calls for the court to "consider whether, beyond a reasonable doubt, any of the . . . aggravating circumstances exist." Keels argues that this sentencing scheme, given that it calls for a determination by "the court" of the existence of a statutory aggravating factor, violates the Constitution on its face, and as applied to him, because under *Apprendi,* "[i]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348 (citation and internal quotation marks omitted).

Consistent with guidance from the Supreme Court, *see National Labor Relations Bd. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), we have steadfastly adhered to the principle that "[w]here a constitutional challenge to a statute is made, and the statutory lan-

---

**9.** In a case similar to Keels's, the Oregon Supreme Court in *State v. Wille,* 317 Or. 487, 858 P.2d 128 (1993), held the retroactive application of an LWOP statute unconstitutional under the *ex post facto* clause. Oregon's former sentencing scheme for first-degree murder carried the possibility of either death or "ordinary life," *i.e.,* life with a mandatory

thirty years' confinement without parole. *Id.* at 138. The Court held that a new intermediate sentence of "true life," *i.e.* LWOP, "clearly is a more burdensome punishment than ordinary life" and, thus, served to "increase[ ] the presumptive punishment for a crime." *Id.* at 139.

guage permits, we construe [the] statute so as to avoid constitutional confrontation." *In re Johnson,* 699 A.2d 362, 369 (D.C. 1997); *cf. Hasty v. United States,* 669 A.2d 127, 130–31 (D.C.1995); *Pearson v. United States,* 581 A.2d 347, 356 (D.C. 1990). Put more directly,"[a]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that one [sic] which will save the act." *Tyler v. United States,* 705 A.2d 270, 279 (D.C.1997) (Schwelb, J., concurring) (quoting *Jones & Laughlin, supra,* 301 U.S. at 30, 57 S.Ct. 615).

Section § 22–2404.1 could be interpreted along the lines proposed by Keels. However, there are situations, such as the one presented here, where a jury, by arriving at its verdict, must have found (implicitly, if not explicitly) beyond a reasonable doubt one of the aggravating factors necessary to trigger the availability of LWOP under D.C.Code § 22–2404.1. By requiring that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum ... be submitted to the jury," *Apprendi, supra,* 530 U.S. at 490, 120 S.Ct. 2348, *Apprendi* forecloses the imposition of punishment "greater ... than that authorized by the jury's guilty verdic[t]." *Id.* at 494, 120 S.Ct. 2348. In situations where a jury makes a finding beyond a reasonable doubt *coextensive* with an aggravating factor contained in D.C.Code § 22–2404.1(b), it fairly can be said that the sentence of LWOP is authorized by the jury verdict. *Cf. Apprendi,* 530 U.S. at 467, 120 S.Ct. 2348 (legislative scheme novel and improper which "removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty exceeding the maximum he would receive *if punished according to the facts reflected in the jury verdict alone* ") (emphasis added); *id.* at 490 ("[i]t is *unconstitutional for a legislature to re-*

*move from the jury the assessment of facts* that increase the prescribed range of penalties to which a criminal defendant is exposed") (citation and internal quotation marks omitted; emphasis added). When the substantive legal inquiry for finding criminal culpability is identical to that required to establish a factor making the offender eligible for increased punishment, a jury's assessment that an offender has committed certain conduct beyond a reasonable doubt serves a dual purpose—to convict that offender of the crime and to establish the qualifying factor. Moreover, when the "facts reflected in the jury verdict" establish eligibility for LWOP, the policy behind *Apprendi,* to preserve the longstanding tradition in our judicial system that an impartial jury, where a defendant exercises that right, must find every element of a crime that exposes the defendant to a harsher prescribed penalty, is not violated. *See id.* at 483, 120 S.Ct. 2348. In these situations, a trial judge imposing a sentence of LWOP is not acting unilaterally, but rather is determining eligibility for the increased sentence on the basis of a jury mandate in the form of a factual finding beyond a reasonable doubt.

 Therefore, in light of our duty under the applicable canons of construction, we hold that in order to sentence an individual to LWOP, any "court finding" or "consideration" that a statutory aggravating factor exists beyond a reasonable doubt under D.C.Code § 22–2404.1 must be predicated upon a jury finding beyond a reasonable doubt of, or coextensive with, that same factor. This does not mean that the trial court is foreclosed from exercising its discretion to impose LWOP. Rather, in order to trigger that discretion, the trial court's "consideration" of the existence of an aggravating factor, or "finding" thereof, must be based on a jury finding beyond a

reasonable doubt on that specific factor.[10] We are satisfied that this construction represents a reasonable interpretation of D.C.Code § 22–2404.1, and that it is consistent with the subsequent legislative amendment to § 22–2404.1. *See supra* note 6.

 In light of our conclusion, Keels's claim that D.C.Code § 22–2404.1 is unconstitutional on its face cannot stand. "[A] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger *must establish that no set of circumstances exists under which the Act would be valid.*" McPherson v. United States, 692 A.2d 1342, 1344 n. 1 (D.C.1997) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)) (emphasis added). Plainly put, there are circumstances under which D.C.Code § 22–2404.1 can be reconciled with *Apprendi*, namely where eligibility for LWOP has been determined on the basis of a jury finding beyond a reasonable doubt that one of the enumerated aggravating factors exists.

### 3.

 In this case, after assessing all of the operative facts, the jury found Keels guilty of first-degree felony murder predicated on robbery. Section 22–2404.1(b)(8), in turn, permits the imposition of LWOP upon a finding that "[t]he murder was committed while committing or attempting to commit a *robbery*, arson, rape, or sexual offense." (Emphasis added.) Thus, the jury's finding of felony murder alone was enough, in the abstract, to support the sentence of LWOP. The problem we confront, however, is that the trial judge exercised her discretion to sentence Keels to LWOP based upon the understanding—which was erroneous in light of *Apprendi*—that three aggravating factors, not one, made him eligible for that sentence. So far as appears from the record, the judge determined his eligibility in combined reliance on the heinousness or cruelty of the crime (D.C.Code § 22–2404.1(b)(4)), the vulnerability of the victim due to age or infirmity (D.C.Code § 22–2404.1(b)(10)), and the fact that the crime was committed during a robbery. Consideration of two of those circumstances as LWOP-*qualifying* factors, without a corresponding jury finding beyond a reasonable doubt, was error, and one that "seriously affected the fairness" of Keels's sentence. *Johnson, supra* note 7. The government responds that aggravating factors such as the cruelty with which a crime is committed or any special vulnerability of the victim long have been considered by sentencing judges in the proper exercise of their discretion. *See Williams v. New York*, 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *Apprendi, supra*, 530 U.S. at 481–82, 120 S.Ct. 2348 (reaffirming *Williams*). We, of course, do not quarrel with that proposition; indeed, on remand the trial judge will remain free to consider those factors in exercising her discretion whether or not to impose LWOP in this case. It is quite another matter, however, for the sentencing judge to believe, as she did in this case, that the offender's eligibility for LWOP has been established on *multiple*

---

10. We see little force to an argument that a trial court's finding beyond a reasonable doubt of an aggravating factor, predicated on a jury finding beyond a reasonable doubt on a coextensive inquiry, is fundamentally different from a direct jury finding beyond a reasonable doubt of the aggravating factor. As long as the determination of LWOP eligibility rests entirely upon a jury finding that implicitly authorizes imposition of that sentence, *Apprendi* is satisfied. In some instances, this may cause the trial judge to utilize special interrogatories or a special verdict form.

statutory grounds when only one of those qualifying grounds has been proven in the manner the Constitution requires. Such a misconception may seriously affect a judge's exercise of sentencing discretion. Basic fairness thus requires that the trial judge conduct the sentencing of Keels uninfluenced by a misapprehension as to the extent of his eligibility for a punishment as severe as LWOP. *See generally United States v. Tucker*, 404 U.S. 443, 448–49, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); *In re L.L.*, 653 A.2d 873, 889 (D.C.1995) ("Where a judge, in exercising her discretion, has ... misapprehended the applicable legal principles, we often remand the case for reconsideration under the correct standards."); *cf. (James) Johnson v. United States*, 398 A.2d 354, 365 (D.C.1979).

 We therefore vacate Keels's sentence and remand for resentencing, so that the judge may impose sentence with appreciation of the limits *Apprendi* imposes on the determination of eligibility for LWOP.[11] We reject Keels's argument that the re-sentencing must take place before a different trial judge. He makes no claim of actual or apparent bias by the trial judge who heard the evidence and is therefore presumptively best equipped to exercise sentencing discretion, nor does he provide us with any reason to doubt that the judge will exercise that discretion conscientiously and in accordance with the law. *See generally, Lucas v. United States*, 602 A.2d 1107, 1109 (D.C.1992).

**11.** Resentencing is a sufficient remedy here under *Apprendi*, because the indictment charged Keels with the LWOP-enabling offense of felony murder robbery and the jury convicted him of that crime. We point out also that we express no opinion regarding the retroactivity of either *Apprendi* or our decision today to previous convictions and sentences that have become final.

## IV. CONCLUSION

The judgment is vacated and the case is remanded for resentencing in accordance with this opinion.[12] On all other grounds, Keels's convictions are affirmed.

*So ordered.*

**12.** In light of the government's concession that Keels's two murder convictions should merge, *see Cowan v. United States*, 629 A.2d 496, 497, 505 (D.C.1993), and that his convictions for felony murder and the predicate offense of armed robbery should merge, *see Waller v. United States*, 531 A.2d 994, 998–99 (D.C.1987); the trial court should vacate the appropriate convictions on remand.