Jasper L. DOCKERY, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–1659, 98–CO–
1725, 02–CO–133.

District of Columbia Court of Appeals.

Argued Dec. 20, 2002.
Decided May 27, 2004.

Francis T. Lacey, Rockville, MD, appointed by the court, for appellant.

Jasper L. Dockery filed a pro se brief and supplemental brief.

Michael C. Liebman, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese III, and Kenneth C. Kohl, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, REID, and GLICKMAN, Associate Judges.

REID, Associate Judge:

After a jury trial, appellant Jasper L. Dockery was convicted of first-degree premeditated murder while armed (of James Ivy), in violation of D.C.Code §§ 22–2401, –3202 (1996);[1] six counts of assault with intent to kill while armed, in violation of §§ 22–501, –3202;[2] two counts of possessing a firearm during a crime of violence ("PFCV"), in violation of § 22–3204(b)[3] and unlawful possession of ammunition, in violation of § 6–2361(3).[4] Mr. Dockery contends, in part, that the trial court erred by (1) admitting certain evidence discovered when the police executed an arrest and a search warrant in May and August 1995 respectively; (2) allowing other crimes evidence to be admitted in violation of Drew v. United States, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964), and Johnson v. United States, 683 A.2d 1087 (D.C.1996) (en banc); (3) precluding the defense from impeaching and exploring the motives of a government witness; and (4) denying his request for a continuance.[5] Unpersuaded by Mr. Dockery's argu-

1. Recodified at D.C.Code §§ 22–2101, –4502 (2001).

2. Recodified at D.C.Code §§ 22–401, –4502 (2001). The persons whom Mr. Dockery was found guilty of assaulting with intent to kill are Willie Ashmon, James Conyers, Kinikki Brown, Shavaughn Royal, Yasmin Chambers, and Everett Newman.

3. Recodified at D.C.Code § 22–4504(b) (2001). One PFCV count pertained to a pistol, and the other to a shotgun.

4. Recodified at D.C.Code § 7–2506.01(3) (2001).

5. Mr. Dockery filed three appeals, all of which have been consolidated. Appeal number 98–CF–1659 was taken from his judgment of conviction. Appeal number 98–CO–1725

ments, we affirm the trial court's judgment of convictions, but remand the case for resentencing in light of *Keels v. United States,* 785 A.2d 672 (D.C.2001).

## FACTUAL SUMMARY

The government presented evidence showing that as early as summer of 1989, Mr. Dockery was the leader of a drug organization that distributed crack cocaine in the 1600 block of E Street, N.E. At least two members of his organization, Harry Louis Williams [6] and Corey Bullock, sold drugs on his behalf from an apartment located at 1620 E Street. During the spring of 1995, Mr. Dockery and his organization were competing with members of the E Street Crew, another drug organization, for business near 1600 E Street.

Around 11:30 p.m. on April 14, 1995, Mr. Dockery, Mr. Williams, and two other members of Mr. Dockery's organization, Glenn Thompson and Denise Sutton, were in the 1620 E Street apartment when gunshots were fired at them from the street level. Mr. Dockery and Mr. Williams returned fire, with both men using their own handguns. No one in the apartment was injured. Police officers eventually recovered 62 shell casings from 9 and 10–millimeter ammunition in the area of the shooting.

Later on Mr. Dockery, Mr. Williams, and Ms. Sutton met with Mr. Bullock at 4223 Gault Place, N.E. Mr. Dockery ex-plained that he believed members of the E Street Crew were behind the shooting and during the conversation revealed a 10–millimeter handgun he was carrying. Mr. Dockery explained to his members that he wanted to "kill" and "get rid of" the E Street Crew persons who were responsible for the shots fired into the 1620 E Street apartment.

A little more than a month after the April 14, 1995 incident, the police were searching for Mr. Bullock. They acted upon information received indicating that Mr. Dockery, Mr. Bullock, and Christopher Trench were living at 4165 Southern Avenue in Capitol Heights, Maryland. Officer Denise M. Calhoun explained that she initially went to an address at "64th Avenue" in Riverdale, Maryland, which she believed to be Mr. Bullock's address. She stated:

> I interviewed some of the neighbors and they told me he was moving out.... [and when I returned on May 23, 1995] you could see from the outside window [that] Mr. Bullock was in the process of moving out.... I was told [by sources] that if he wasn't [at the Riverdale address] he would be with Mr. Dockery. So I had Mr. Dockery's address and that is where I responded to, [4165 Southern Avenue]. I interviewed people that worked [at the apartment complex including] ... the resident manager and ... a worker.... The lease was under

---

resulted from the trial court's denial of his motion for a new trial; no issue relating to the denial of that motion has been raised on appeal. Appeal number 02–CO–133 was filed after the trial court's denial of his April 10, 2001, D.C.Code § 23–110 (2001) motion which alleged ineffective assistance of counsel and newly discovered evidence; Mr. Dockery raises no issues on appeal relating to the denial of this motion. In a supplemental brief, dated April 9, 2002, which apparently was prepared by Mr. Dockery but filed by his appellate counsel "per client request," issues are raised which were not aired in the trial

court. We do not consider those issues. *See Miller v. Avirom,* 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967).

6. Mr. Williams was indicted along with Mr. Dockery as a codefendant on all charges. In addition, Mr. Williams was indicted alone for carrying a pistol without a license in violation of D.C.Code § 22–3204(a) (1996) (recodified at § 22–4504(a) (2001)). The court granted his motion to sever his trial and he later pleaded guilty to two counts of second-degree murder while armed and testified for the government at Mr. Dockery's trial.

[the names of] Mr. Dockery and Christopher Trench .... [A]fter I went out and started to do a little more investigating, I met with one of the other workers[, showed him a picture of Mr. Bullock] and ... [he said] ... Mr. Dockery was living there, and ... Cory Bullock was living there as well.... The source told me he had seen that gentleman I was looking for, Mr. Bullock, the night before with Mr. Dockery, leaving the building, driving off.... [He] told me what kind of car to look out for and early [on the morning of May 24th] I looked out and the car was there [at Mr. Dockery's address].

The police entered into the Southern Avenue residence on May 24, 1995, in an attempt to arrest him on a charge of assault with intent to kill. Mr. Dockery was inside, but Mr. Bullock was not there. While the police were inside the premises, they saw a shotgun; and they asked Mr. Dockery about wooden boards that were attached to a sliding glass window. Mr. Dockery explained that the boards were for his protection because someone had tried to shoot him. Mr. Bullock returned to the Southern Avenue premises around four hours later and was arrested.

On July 27, 1995, another shooting took place. Earlier that day Mr. Dockery told Mr. Williams that he was tired of being shot at by members of the E Street Crew. Mr. Dockery offered to pay $5,000 for one of the members of his organization to kill rival members of the E Street Crew. He instructed Mr. Williams and three other members of his organization to drive his white Dodge Caravan, take some weapons, hide in a vacant apartment in a building near 1620 E Street, and shoot at two members of their rival drug organization.

After they entered the vacant apartment, Mr. Williams and those who accompanied him learned that Mr. Ivy and other members of the E Street Crew were exiting a van. The men left the apartment and began firing at those who were getting out of the van. Mr. Ivy and at least one other E Street Crew member were hit by gun fire; Mr. Ivy died later. After the shooting, Mr. Williams and those who accompanied him fled the area, leaving behind in the apartment some of the weapons they used and ammunition from a 10–millimeter shotgun. Police later found the weapons and ammunition and determined that the ammunition from the July 27th shooting was the same type used in the April 14th shooting.

On August 10, 1995, police officers executed a search warrant at the Southern Avenue residence of Mr. Dockery. They recovered shotgun shells and casings that matched those found at the scene of the July 27th shooting. They also saw that the sliding door, which had previously been covered with wooden boards, now had steel plates on the inside. *Id.* Pertinent paragraphs of the affidavit incorporated in the search warrant stated:

[The] affiant submits that based on the facts outlined in this affidavit, there is probable cause to believe that JASPER LLOYD DOCKERY, and others known and unknown to me have unlawfully entered into, confederated, conspired, and agreed to acts which are in violation of the federal drug laws, to wit: the unlawful distribution of a controlled substance.

. . . .

As a result of my personal participation in this investigation and reports made to me by other Special Agents of the FBI and Investigators of the Metropolitan Police Department, I am familiar with the circumstances of the offenses described in this affidavit. On the basis of this familiarity, I allege that the facts contained in the affidavit reveal a major conspiracy and continuing criminal enterprise being conducted by DOCKERY

and his associates to distribute cocaine in the greater Washington, D.C. metropolitan area and elsewhere.

. . . .

On July 8, 1994 [a source] gave detailed information regarding Jasper Dockery and his drug organization. [The source] stated that Dockery was the leader of a crack cocaine distribution organization that operated in various locations in the Washington, D.C. metropolitan area.

[The source] provided information describing Dockery's travels to New York to pick up cocaine to be sold by himself and members of his organization in the Washington, D.C. area. . . . [The source] stated that upon his return to the Washington, D.C. area, Dockery would immediately take the cocaine to 4165 Southern Avenue, Apartment T2, Capitol Heights, Maryland . . . [where he] cook[s] the cocaine powder into crack and prepare[s] it for distribution. . . .

. . . .

In July and August, 1995, [another source] . . . witnessed Dockery delivering crack cocaine to be sold by members of his organization in the area of the 1600 block of E Street, N.E. and 217 51st Street, N.E., Apartment 22. . . .

. . . .

[That source] state[d] that it has seen Dockery in possession of a handgun as recently as the last week of July, 1995.

[That source also] stated that a member of Dockery's organization has told [him] that he has been ·to Dockery's apartment at Southern Avenue and sold drugs at that location for Dockery as recently as June, 1995.

. . . .

On April 15, 1995, [one man was murdered, another] injured in a drive-by shooting that occurred at the intersection of 16th and E Streets, Northeast, in Washington, DC. At least four witnesses have . . . identified [the vehicle used in the crime] as the same car usually driven by JASPER DOCKERY and his associates. Witnesses on the scene . . . also stated that th[is] car . . . was occupied by three to four black males, including COREY BULLOCK, a known member of Dockery's organization.

. . . .

An eyewitness . . . positively identified one of the shooters [of a nine-year-old child on July 3, 1995] as Jasper Dockery.

On July 27, 1995, James Ivy was murdered in a shooting that occurred in front of 1629 E Street, Northeast, in Washington, DC. Eyewitnesses have placed JASPER DOCKERY on the scene at the time of the murder and have identified one of his known associates, HENRY LEWIS WILLIAMS, as one of the three or four shooters.

Mr. Dockery was subsequently apprehended at his apartment in Brooklyn, New York.[7]

## ANALYSIS

### *The May 1995 Arrest Warrant for Mr. Bullock*

█ Mr. Dockery contends that the trial court erred by admitting or using evidence that the police discovered during the execution of an arrest warrant for Mr. Bullock at Mr. Dockery's Southern Avenue residence on May 24, 1995.[8] Evidence re-

---

7. During an interview after police arrested him in New York, Mr. Dockery stated that the "guys around E Street" do all of the shooting and indicated that police should not focus their investigation on him. He also stated that "there was crack cocaine in the District

[ ] before Jasper Dockery and there'll be crack cocaine after [him]." *Id.*

8. Mr. Dockery makes certain arguments in this appeal which we dispose of summarily. As the government noted, none of these issues

vealed that Mr. Bullock also lived there. He argues that the police officers could not have reasonably believed that Mr. Bullock resided at his apartment, and that they were required to have a search warrant in addition to an arrest warrant in order to lawfully take notice of the shotgun that was subsequently found.

Conversely, the government claims that Officer Calhoun, the investigating officer, observed Mr. Bullock moving out of his previous residence; that a reliable source told her that Mr. Bullock was residing with Mr. Dockery and described the car that the two men were seen riding in together; and that she later confirmed information from her source when she saw that car near Mr. Dockery's apartment complex. Therefore, the government argues, the officer had reason to believe Mr. Bullock resided at that apartment.

 " 'Our standard of review for a trial court's ruling on a motion to suppress tangible evidence requires that the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court's ruling.' " *United States v. Watson*, 697 A.2d 36, 38 (D.C.1997) (quoting *Holt v. United States*, 675 A.2d 474, 478 (D.C.1996)). "While factual findings will not be disturbed if supported by substantial evidence, conclusions of law are reviewed *de novo.*" *Id.* This court "view[s] the evidence in the light most favorable to the ... [g]overnment [ ] and consider[s] both evidence offered at the suppression hearing and admitted at trial." *United States v. Munoz*, 150 F.3d 401, 411 (5th Cir.1998).

 With respect to Fourth Amendment legal principles, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe [he] is within." *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Furthermore, "in order to authorize entry into a person's home to execute a warrant for his arrest, the [police] officer's belief that the residence to be entered is the home of the person named in the warrant need not be supported by 'probable cause.' Rather, the proper inquiry is whether there is a reasonable belief that the suspect resides at the place to be entered to execute [the] warrant, and whether the officers have reason to believe that the suspect is present." *United States v. Lovelock*, 170 F.3d 339, 343 (2d Cir.1999) (quoting *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir.1995)) (internal quotation marks omitted); *see also United States v. Risse*, 83 F.3d 212, 216 (8th Cir.1996).

were included in his § 23–110 motion. Consequently, "[q]uestions not properly raised and preserved during the proceedings under examination ... [are] normally [ ] spurned on appeal." *Miller v. Avirom*, 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (D.C.Cir. 1967); *see also Gaither v. United States*, 759 A.2d 655, 657, n. 5 (D.C.2000) (treating defendant's appeal as abandoned where he failed to challenge trial court's order denying his motion to vacate his convictions). In any event, there is no evidence in the record to support Mr. Dockery's claims that the trial court placed a "strict time limitation" on his defense counsel's direct examination of Tommy Ferguson. Nor does the record support his contention that the trial court, a United States

Attorney (Mr. Kohl) and defense counsel "coerced and pressured" Mr. Ferguson to "testify falsely" or committed any ethical violations. Moreover, the indictment "contain[s] all the essential elements of the offense charged." *United States v. Bradford*, 482 A.2d 430, 432 (D.C.1984). Therefore, it "sufficiently apprise[d][him] of the nature of the accusations against him." *Id.* (citations omitted). In addition, this Court is "in no position to second-guess, ... credibility determination[s] by [the] trier[s] of fact" regarding the testimony of Mr. Williams and others which Mr. Dockery now labels as "false [and] unreliable." *Lee v. United States*, 668 A.2d 822, 833, n. 26 (D.C.1995).

Here, the trial court properly framed the question as to whether the police reasonably believed Mr. Bullock lived at the Southern Avenue residence with Mr. Dockery and was present. Officer Calhoun testified that she went to a residence along 64th Avenue in Riverdale after initially being told that Mr. Bullock lived there. But after "interview[ing] some of the neighbors," she learned that "he was moving out." *Id.* Around May 22, 1995 another source told her that "if he wasn't [at the Riverdale residence] he would be with Mr. Dockery," *Id.* at 17. Officer Calhoun then proceeded to Mr. Dockery's apartment complex at 4165 Southern Avenue. *Id.* While there, she interviewed several employees including "the resident manager and ... a worker." *Id.* She learned that although Mr. Bullock's name was not on the lease for the Southern Avenue residence, a worker to whom she spoke and showed a picture of Mr. Bullock acknowledged that "Mr. Dockery was living [in the apartment] ... [along with] [Mr.] Bullock." *Id.* at 18. The worker "told [her] that he had seen ... Mr. Bullock, the night before with Mr. Dockery, leaving the building, driving off." *Id.* at 19. Furthermore, that particular source told her "what kind of car to look out for." *Id.* And, before executing the warrant on May 24th, she "looked outside the [apartment] and the car was there." *Id.*

We conclude that the totality of the facts and circumstances within Officer Calhoun's knowledge ..., warranted "a reasonable belief that [Mr. Bullock] reside[d] at [4165 Southern Avenue] ... [and that the officer had] reason to believe that [Mr. Bullock was] present." *Lovelock, supra,* 170 F.3d at 343 (quoting *Lauter, supra,* 57 F.3d at 215); *see also Valdez v. McPheters,* 172 F.3d 1220, 1224 (10th Cir.1999); *United States v. Magluta,* 44 F.3d 1530, 1535 (11th Cir.1995). Thus, the entry into the premises at 4165 Southern Avenue was not illegal.

### The August 1995 Search Warrant of Mr. Dockery's Residence

█ Mr. Dockery's second argument concerns the trial court's denial of his motion to suppress the evidence obtained during a search warrant of his residence on August 10, 1995. He contends that the information police submitted in obtaining the search warrant did not establish probable cause, and therefore, the warrant was defective. He claims that two of the sources that the officers relied upon reported "wrongdoing allegedly committed by [him] six ... and ... four years prior to the affidavit, and [ ], in [ ] entirely different location[s]." *Id.* He further maintains that the affidavit fails to indicate that there were "signs ... of [ ] drug trafficking" in May 1995 when the police sought to arrest Mr. Bullock at the Southern Avenue premises. *Id.* at 10.

In contrast to Mr. Dockery's arguments, the government claims that under the totality of the circumstances in this case, the issuance of the search warrant was based on probable cause. The government emphasizes Mr. Dockery's failure to consider several paragraphs of the affidavit which, among other things, include a statement by an informant indicating that Mr. Dockery "had been the leader of a drug organization since 1989" and another statement by "an eyewitness to a drive-by shooting on July 3, 1995 ... identif[ying Mr. Dockery] as one of the shooters."

█ "In reviewing a challenge to the validity of a warrant, [this Court] considers only the content of the supporting affidavit." *Chavez–Quintanilla v. United States,* 564, 788 A.2d at 567 (D.C.2002). "In so doing ... [it] accord[s] deference to the judicial decision of the judge or magistrate who issued the warrant, so long as there is a substantial basis for concluding the existence of probable cause." *Id.* (citations omitted). Furthermore, "probable

cause to search ... is measured by the totality of the circumstances [and] ... [t]his question ... 'is to be viewed from the vantage point of a prudent, reasonably cautious police officer ... guided by his experience and training." *Id.* (quoting *United States v. Davis*, 147 U.S.App.D.C. 400, 402, 458 F.2d 819, 821 (D.C.Cir.1972) (internal citation omitted)). "Thus the question [to be] decide[d], giving deference to the judge who issued the warrant, is whether there was a substantial basis in the affidavit supporting the warrant to conclude, under the circumstances, that there was good reason to believe that [evidence of drug distribution and Mr. Dockery's involvement in the murder of Mr. Ivy] were likely to be in" his apartment at 4165 Southern Avenue. *Id.*

Furthermore, "[i]nstead of measuring staleness solely by counting the days on a calendar, courts must also concern themselves with the following variables: the character of the crime [ ], the [background of the] criminal, the thing to be seized[, and] the place to be searched." *United States v. Spikes*, 158 F.3d 913, 923–24 (6th Cir.1998) (internal quotation marks and citation omitted); *see also United States v. Vaandering*, 50 F.3d 696, 700 (9th Cir.1995) (nearly two-year-old information not stale because of ongoing criminal enterprise). In addition, "[t]he issuance of a warrant [ ] signifies that a judicial officer has made a determination that there are reasonable grounds to believe that the information underlying the warrant is true and is of sufficient reliability and timeliness to justify a search." *Williams v. United States*, 576 A.2d 700, 704 (D.C. 1990).

This case involved ongoing criminal activity relating to drugs and the activities of rival drug organizations. According to paragraph fourteen of the affidavit accompanying the warrant, a police source "stated that [Mr.] Dockery was the leader of a crack cocaine distribution organization that operated in various locations in the Washington, D.C. metropolitan area." Paragraph 15 reveals that the same source told police Mr. Dockery "travel[s] to New York City" to pick up cocaine to be sold by himself and members of his organization.... and "that upon his return to the Washington, D.C. area, [Mr.] Dockery would immediately take the cocaine to 4165 Southern Avenue, Apartment T2, Capitol Heights, Maryland... to cook the cocaine powder into crack and prepare it for distribution." *Id.*, p. 5. Paragraph seventeen indicates that another source informed police in July and August 1995, that Mr. Dockery had headed "a drug organization since early 1989" and he "has witnessed [Mr.] Dockery delivering crack cocaine to be sold by members of his organization in the area of the 1600 block of E Street, N.E. and 217 51st Street, N.E., Apartment 22." *Id.* And, in paragraph nineteen, police declared that another source told them "[Mr.] Dockery is known to be armed with a handgun at all times ... [and that he saw] [Mr.] Dockery in possession of a handgun as recently as the last week of July, 1995." *Id.*, p. 6.

Furthermore, paragraph twenty states that the same source told police that "a member of [Mr.] Dockery's organization [ ] told [him] that he has been to Dockery's apartment at Southern Avenue and sold drugs at that location for [Mr.] Dockery as recently as June, 1995." *Id.* According to paragraph twenty-three, "surveillance[ ] conducted [by the police] from April, 1995 to [the early part of August, 1995] at 4165 Southern Avenue ... revealed several vehicles associated with [Mr.] Dockery and his organization [ ] parked in the front and rear of [his apartment]." *Id.* at pp. 6–7. Paragraph twenty-six states that an eyewitness to a drive-by shooting on July 3, 1995 along E Street, Northeast, "positively identified one of the shooters as Jasper

Dockery." *Id.* at p. 7. And, paragraph twenty-seven states that another eyewitness "placed [Mr. Dockery] on the scene at the time of the murder" of Mr. Ivy on July 27, 1995, "in front of 1629 E Street, Northeast." *Id.* at p. 8.

Clearly, the affidavit in support of the search warrant reflected ongoing criminal activity on the part of Mr. Dockery and others, from 1989 to June and July 1995. Thus, as in *Vaandering, supra,* 50 F.3d at 700, "the older information was coupled with recently obtained information" and the trial court "could properly find that this evidence was not stale and was an allowable base upon which to find probable cause." Moreover, the information was based on confidential sources, and that information was "verified and corroborated by independent investigation." The information was quite specific in its details, providing a "substantial basis," both factual and legal, for the trial judge's find[ing] of "probable cause" to believe that evidence of drug distribution and the murder of Mr. Ivy would be found at Mr. Dockery's apartment.[9]

### Other Crimes Evidence Issue

▪▪▪▪ Mr. Dockery next argues that the trial court erred "by allowing the government to introduce evidence of drug trafficking, evidence surrounding evidence of [his] arrest ... in New York, [and]

evidence of [the] shooting which occurred on April 14."[10] The government claims that "evidence of [Mr. Dockery's] narcotic activities was vital to establishing motive and [ ] inextricably intertwined with the charged offenses." It also maintains that "evidence of [the April 14] shooting was [ ] directly relevant to motive." *Id.* at 40.

▪▪▪▪ "A decision on the admissibility of the evidence ... is committed to the sound discretion of the trial court and [this Court] will not disturb its ruling absent an abuse of discretion." *Smith v. United States,* 665 A.2d 962, 967 (D.C.1995). "Ordinarily, any evidence which is logically probative of some fact in issue is admissible, unless it conflicts with some settled exclusionary rule." *Martin v. United States,* 606 A.2d 120, 128 (D.C.1991) (internal citation omitted). Moreover, "other crimes evidence" is permitted under *Drew, supra,* "when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial." *Id.* at 90. Relevant evidence is any evidence that "tends to make" the proposition for which it is offered more or less probable than without it. *Punch v. United States,*

---

9. Alternatively, Mr. Dockery contends: "Assuming *arguendo* that the evidence linking [him] to the shootings and his May 'admission' that he owned other firearms besides the shotgun, gave probable cause to search [his] apartment for weapons, the scope of the warrant ... is constitutionally defective." He maintains that "[g]iven the wide range of personal papers set forth in [that attachment] and seized during the search, the warrant ... was ... overbroad in that it permits police to seize evidence of [his] mere 'associations.'" *Id.* In light of our conclusion that probable cause existed to support the search warrant, we see no need to address this alternative argument. Mr. Dockery also claims that "the

*seizure of the papers* actually taken from [his apartment] likely exceeded the scope of a properly limited warrant." (emphasis added). But the government correctly points out that he fails to identify these "papers." And, this Court does not address claims that have not been properly developed. *See Wagner v. Georgetown Univ. Med. Ctr.,* 768 A.2d 546, 554 n. 9 (D.C.2001).

10. Mr. Dockery also challenges the admission of "evidence of other crimes" but fails to specify which evidence he is referring to and does not offer any argument on this point. So this Court need not address it. *See Wagner, supra.*

377 A.2d 1353, 1358 (D.C.1977). On the other hand "*Drew* does not apply where such evidence . . . is direct and substantial proof of the charged crime." *(William) Johnson v. United States*, 683 A.2d 1087, 1098 (D.C.1996). Such "non-*Drew*" evidence is therefore admissible, if relevant, because "it is too intimately entangled with the charged criminal conduct." *Toliver v. United States*, 468 A.2d 958, 960 (D.C. 1983).

Here, the trial court permitted testimony about the April shooting under *Drew, supra*, since it helped to establish "the motive for the shooting at E Street Crew members." Both "defendants [were] hotly contesting whether either of them had a motive" to commit the killings. The court further reasoned that this evidence helped to explain that "the relationship between Williams and Dockery [was] to give or obey orders," *id.*, and to identify Mr. Dockery as a leader of the April 1995 incident. Both 9 and 10–millimeter guns were used during the April 14th shooting, the same type of guns Mr. Dockery provided to the three shooters for the July 27th shooting. Hence, the evidence from the April incident helped to identify and connect him with the later shooting. *See Busey v. United States*, 747 A.2d 1153, 1165 (D.C.2000) (finding that evidence of .38 caliber cartridges found in the defendant's apartment helped connect him with the murder and was thus properly admitted).

Furthermore, the evidence of Mr. Dockery's drug trafficking was "highly relevant and material to the government's case." Mr. Dockery ordered Mr. Williams and another person to shoot at rival members of the E Street Crew, but he was not directly involved in the July 27 shooting. "[W]ithout such evidence, the shooting [w]ould have made little sense to the jury, in light of what might have been seen as the otherwise incomplete and confusing facts of the case." *Daniels v. United States*, 613 A.2d 342, 348 (D.C.1992). Mr. Dockery targeted members of the E Street Crew in both incidents because of his drug activities. And the April 1995 shooting occurred inside the apartment at 1620 E Street Northeast, along the block that was central to the dispute involving the two drug organizations. The evidence concerning the April 1995 incident, and that pertaining to Mr. Dockery's drug activities, was admitted properly to show motive and identity, unless the risk of unfair prejudice substantially outweighed its highly probative value. *Johnson, supra*, 683 A.2d at 1092, 1099.

In weighing the probative value of this evidence against its prejudicial effect, the trial court considered "the strength of the evidence, its similarities [to the charged offenses], the closeness in time, alternative ways of getting at the same evidence or sanitizing the evidence as it comes in, [and] the degree of prejudice or hostility that would be generated by the evidence." Under the circumstances of this case, we are satisfied that the trial court reasonably concluded that the risk of unfair prejudice did not substantially outweigh the highly probative value of the April 1995 shooting and the drug activity of Mr. Dockery.

### The Precluded Testimony of a Defense Witness

 Mr. Dockery contends that the trial court erred in refusing to permit his witness, Mr. Billy Jones, to testify about a shooting in which Mr. Williams, originally Mr. Dockery's co-defendant who entered a plea and testified against Mr. Dockery, was involved—presumably on his own and not at the direction of Mr. Dockery. He claims this testimony about the shooting of "Melvin Jones known as Renie . . . in the 1600 block of E Street," sometime after mid April 1995, but before the July 1995 shooting of Mr. Ivy, would have established that Mr. Williams "had a motive to

lie and in fact had lied" during his testimony. *Id.* In essence, it would have shown that Mr. Williams was not acting at the direction of Mr. Dockery. The government objected to the testimony essentially because the defense would be unable to sustain its "burden . . . to show that this was a shooting that was done apart from [Mr.] Dockery['s direction]."

The trial court disallowed Mr. Billy Jones' testimony about the fatal shooting of Mr. Melvin Jones because it "would invite a trial on that . . . shooting, and what the motive was and who else was behind it. . . .," without any "evidence other than the fact of the shooting that Mr. Dockery was not behind it." The trial court added, "the issue is whether [Mr. Williams] acted on July 27th [1995] at [Mr.] Dockery's direction, and we are not [going to] have a trial as to whether he acted on [Mr.] Dockery's direction on some other day."

■■■■■ "[T]he evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and [this Court] owe[s] a great deal of deference to its decision." *Johnson, supra,* 683 A.2d at 1095. Furthermore, " '[a]n evidentiary ruling by a trial judge on the relevancy of a particular item is a highly discretionary decision that will be upset on appeal only upon a showing of grave abuse.' " *Carr v. United States,* 585 A.2d 158, 163 (D.C. 1991) (quoting *Roundtree v. United States,* 581 A.2d 315, 328 (D.C.1990) (other internal quotation marks omitted)). Moreover, the trial "court has a duty to exclude confusing and distracting evidence on collater-

al issues." *Id.* (citation omitted). And, it can exclude evidence that would unnecessarily prolong the trial. *Reed v. United States,* 584 A.2d 585, 591 (D.C.1990).

Here, the testimony about the shooting of Mr. Melvin Jones would have been confusing if permitted. Mr. Williams testified that he did not shoot at members of the E Street Crew for his "own purposes." Other than the April and July 1995 shootings, he was never questioned about any others in which he was involved, whether on his own or in Mr. Dockery's behalf. Under these circumstances, the trial court did not abuse its discretion by refusing to allow Mr. Billy Jones to testify about the fatal shooting of Mr. Melvin Jones.[11]

### Denial of Mr. Dockery's Request for a Continuance

■■■■■ Mr. Dockery maintains that the trial court "denied [him] of his right not to testify" by refusing his request for a recess so he could "obtain the presence of certain witnesses." He claims that the trial court made him choose between testifying and "hav[ing] an opportunity to present a defense" or refusing to do so and forgoing that opportunity. *Id.* at 17. The government claims that while Mr. Dockery sought to testify after calling all of his witnesses, he failed to explain then or now "how his testimony would have differed if these other witnesses had testified before him." The government also asserts that it is not "clear that a continuance would have enabled [him] to secure the witnesses" he sought. *Id.* at 44.

■■■■■ The "denial of a continuance is a matter within the sound discretion of the

---

11. Mr. Dockery also questions "whether an individual who is not a target of the shooting and is not actually shot is the victim of an [assault with intent to kill while armed]." He failed to raise this claim to the trial court below; in any event, this court has answered that question affirmatively. *See Mungo v.*

*United States,* 772 A.2d 240, 245–46 (D.C. 2001) (defining assault to include an attempt to cause injury); *(Steven) Brooks v. United States,* 655 A.2d 844, 846–49 (D.C.1995) (discussing doctrine of transferred intent); *Ruffin v. United States,* 642 A.2d 1288, 1293–96 (D.C. 1994) (same).

court and is not subject to review absent clear abuse." *Brown v. United States,* 244 A.2d 487, 489 (D.C.1968) (citation omitted). A request for a "continuance to secure witnesses [requires a] show[ing as to] 'who the[ ] [witnesses] [we]re, what their testimony [would have been], that it w[as][.] relevant under the issues in the case and competent, (and) that the witnesses [could] probably be obtained if the continuance [wa]s granted." *Holt v. United States,* 381 A.2d 1388, 1391 (D.C.1978) (quoting *Neufield v. United States,* 73 App.D.C. 174, 179, 118 F.2d 375, 380 (D.C.Cir.1941)) (other citation omitted). A showing also must be made that "due diligence has been used to obtain the[ ] witnesses['s] attendance for the trial." *Neufield, supra,* 118 F.2d at 380.

After the government rested its case, the only identified witness available for the defense was Mr. Dockery. He declared that he was "not prepared to testify and unwilling to testify unless he can be guaranteed that ... the other witnesses that he want[ed] will be made available." *Id.* at 1177. However, he never directly requested a continuance. In any event, his counsel identified two of the witnesses as "Margaret Smith ... and Glenn Thompson." *Id.* And, the record indicates that he tried to ensure their appearance with assistance from the prosecutor and by way of a "bench warrant" that the trial court had previously issued. *Id.* at 1177, 1179. But Mr. Dockery failed to indicate the nature of the witnesses' testimony or how their testimony was relevant to the case. In an effort to encourage him to explain his position, the court stated that it "[did]n't quite understand how [his] testimony depends on whether [the] other witnesses are available [ ], or not. . . . [He] can only testify as

to things in [his] firsthand knowledge which shouldn't change depending on who else is [going to] testify." *Id.* at 1177–78. Mr. Dockery only insisted, however, that he was not willing to testify. *Id.* at 1178–79. He offered no further explanation then and fails to do so now. On this record we see no abuse of trial court discretion in the direction to Mr. Dockery to testify at that point or rest his case, since he failed to satisfy the *Holt* or *Neufield* factors.[12]

### Remand for Sentencing

On October 30, 1998, the trial court sentenced Mr. Dockery to life without parole ("LWOP") for his first-degree murder conviction, pursuant to D.C.Code § 22–2404.1(b)(2) and (11). On January 14, 2002, in denying Mr. Dockery's § 23–110 motion for ineffective assistance of counsel and a new trial based on newly discovered evidence, the court stated:

> In light of the holding in *William Keels v. United States,* [785 A.2d 672 (D.C.2001),] and the fact that the aggravating factors (D.C.Code § 22–2404.1(b)(2) and (11)), which caused this Court to impose life without parole, had not been the subject of a special verdict form, this Court will reduce Defendant's sentence for first-degree murder to thirty years to life imprisonment when the record is remanded from the Court of Appeals.

In *Keels, supra:*

> [W]e h[e]ld that in order to sentence an individual to LWOP, any "court finding" or "consideration" that a statutory aggravating factor exists beyond a reasonable doubt under D.C.Code § 22–2404.1 must be predicated upon a jury finding beyond a reasonable doubt of, or coextensive with, that same factor. This

12. Mr. Dockery further argues that the trial court's refusal to grant him a continuance is "clearly erroneous" particularly in light of the fact that the trial judge took "a 3–week break

in the trial so that [she] could go on vacation and the government presented about 3 weeks of testimony." However, these claims are not relevant to the *Holt* or *Neufield* factors.

does not mean that the trial court is foreclosed from exercising its discretion to impose LWOP. Rather, in order to trigger that discretion, the trial court's "consideration" of the existence of an aggravating factor, or "finding" thereof, must be based on a jury finding beyond a reasonable doubt on that specific factor.

*Id.* at 685–86 (footnote omitted).[13] We remanded the case for resentencing. *Id.* at 686–87, n. 11 (resentencing was a "sufficient remedy" since jury convicted Mr. Keels of the crimes charged).

Here, the verdict for first-degree premeditated murder while armed did not include a finding of the aggravating factors of § 22–2104.01(b)(2) and (11)(2001)(previously codified at D.C.Code section 22.2404.1(b)(2)and (11)(1996). As the trial court noted, a special verdict form would have been appropriate; *see Keels, supra,* 785 A.2d at 686 n. 10 (recognizing that "in some instances, ... the trial judge [may] utilize special interrogatories or a special verdict form"). No set of facts presented by the government during trial indicates the reasoning or findings behind the jury's verdict.[14] As in *Keels, supra,* remand for resentencing "is sufficient" on this record since the jury convicted Mr. Dockery of the crimes charged. *Id.* at 687, n. 11. We agree with the government that the trial court should have the opportunity to resentence on all charges, as the structure of the entire sentence may have been affected by the LWOP sentence for first-degree murder. *See Thorne v. United States,* 471 A.2d 247, 249 (D.C.1983).

Accordingly, for the foregoing reasons, we affirm the judgments of the trial court, but consistent with the trial court's ruling, remand the case for resentencing.

*So ordered.*

**13.** D.C.Code § 22–2104.01(a), (b)(2) and (11) (2001) (previously codified at D.C.Code § 2404.1(a), (b)(2) and (11) (1996)) provide in pertinent part:

(a) If a defendant is convicted of murder in the first degree, and if the prosecution has given the notice required under § 22–2104(a), a separate sentencing procedure shall be conducted as soon as practicable after the trial has been completed to determine whether to impose a sentence of more than 60 years up to, and including, life imprisonment without possibility of release.
(b) In determining the sentence, a finding shall be made whether, beyond a reasonable doubt, any of the following aggravating circumstances exist:

. . . .

2) The murder was committed for hire;

. . . .

(11) The murder is committed after substantial planning;

. . . .

**14.** Nonetheless, the government maintains that this Court's holding in *Keels, supra,* was satisfied. They rely on the following passage:

[T]here are situations, such as the one presented here, where a jury, by arriving at its verdict, must have found (implicitly, if not explicitly) beyond a reasonable doubt one of the aggravating factors necessary to trigger the availability of LWOP under D.C.Code § 22–2404.1.

*Id.* at 685. The government asserts that the jury must have "implicitly found that the murder of Mr. Ivy was a murder for hire and that it occurred after substantial planning, the two aggravating factors that the trial court" relied upon. The record contains evidence that Mr. Dockery offered to pay $5,000 for one of the members of his organization to kill rival members of the E Street Crew; that Mr. Dockery provided the weapons and plotted the shooters' route to and from the site of the shooting. However, our holding in *Keels, supra,* is clear. It specifically requires, as the government acknowledged, a "jury finding beyond a reasonable doubt" or coextensive with the particular aggravating factors under D.C.Code § 22–2404.1 in order to trigger the trial judge's discretion to impose LWOP. *Id.* at 685–86.